1
2
3
4
5
6
7

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

JESSE G. COOPER, in his Personal Capacity and as Personal Representative of the Estate of PAULA LEE JEFFERSON, deceased; DEVIN B. COOPER, in his Personal Capacity; DEREK B. COOPER, in his Personal Capacity; and L.C., a minor, by and through her brother and general guardian, JESSE G. COOPER,

Plaintiffs,

v.

WHATCOM COUNTY, a political subdivision of the State of Washington; NORTHWEST REGIONAL COUNCIL, a Washington non-profit corporation; PEACEHEALTH, d/b/a PeaceHealth St. Joseph Medical Center, a Washington non-profit corporation; BILL ELFO, in his Personal Capacity; WENDY JONES, in her Personal Capacity; CALEB ERICKSON, in his personal capacity; STUART ANDREWS, in his Personal Capacity; SHELLY ANDREWS, in her Personal Capacity; KRISTINE GLASGOW, in her Personal Capacity; ADAM MILLER, in his Personal Capacity; CHERYL CARDINAL, in her Personal Capacity; MATT TURNER, in his Personal Capacity; JASON MCDONALD, in his Personal Capacity; MATTHEW CHARROIN, in his personal capacity; TIM KIELE, in his Personal Capacity; KRISTA ROBINSON, in her Personal Capacity; JEFFERY HINDMAN, in his Personal Capacity; VIOLET IGNASHOVA, in her

NO. _____

**COMPLAINT**

**JURY DEMANDED**

COMPLAINT - 1

Personal Capacity; MIRIAH BROWN, in her
Personal Capacity; JOSHUA FARMER, in his
Personal Capacity; and JOHN DOES 1-20,

Defendants.

Plaintiffs, by and through their attorneys of record, Gabriel S. Galanda and Ryan D. Dreveskracht, of Galanda Broadman, PLLC, allege and claim as follows upon personal knowledge as to themselves as to their own actions, and upon information and belief upon all other matters:

## I.    PARTIES

1.    Plaintiff JESSE G. COOPER is the duly appointed Personal Representative of the Estate of his mother, PAULA LEE JEFFERSON.  This is an action arising from Paula's wrongful and unnecessary death and the Defendants' negligence, gross negligence, and deliberate indifference to her serious medical condition and conditions of confinement.  The claims herein include all claims for damages available under Washington and federal law to Paula, her Estate, and all statutory and actual beneficiaries.

2.    JESSE G. COOPER is Paula's son.  He brings suit in his Personal Capacity and is entitled to damages for the loss of his mother.

3.    DEVIN B. COOPER is Paula's son.  He brings suit in his Personal Capacity and is entitled to damages for the loss of his mother.

4.    DEREK B. COOPER is Paula's son.  He brings suit in his Personal Capacity and is entitled to damages for the loss of his mother.

5.    L.C. is Paula's minor daughter.  She brings suit in her Personal Capacity, by and through her brother and general guardian, JESSE G. COOPER, and is entitled to damages for the loss of her mother.

6.    Defendant WHATCOM COUNTY is a political subdivision of the State of Washington.  Whatcom County has various departments including, but not limited to, the

COMPLAINT - 2

Whatcom County Sheriff's Office and its Bureau of Custody and Corrections Services, which operates the jail.  Whatcom County is, and was at all times mentioned herein, responsible for the actions or inactions, and the policies, procedures, and practices/customs of all correctional health services relating to the Whatcom County Jail ("Jail").  Whatcom County cannot contract-away its obligation to keep inmates in its custody in health and free from harm.  Whatcom County is legally liable for the breach of this duty by such providers.  *West v. Atkins*, 487 U.S. 42, 56 (1988).  As a local government, Whatcom County is a "person" under 42 U.S.C. § 1983 and may be sued for constitutional injuries.  *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694 (1978).  Defendant Whatcom County, its jailers, and jail administrators—named and unnamed, identified and unidentified—are hereafter identified collectively as "Whatcom County."

7.      Defendant NORTHWEST REGIONAL COUNCIL ("NRC") is a Washington non-profit corporation, with its principal place of business believed to be Bellingham, Whatcom County, Washington.  NRC is a health care entity organized under the laws of the State of Washington.  NRC assumed a traditional governmental function and acted under color of state law by supplying Jail pretrial detainees with medical care.  *Burke v. Regalado*, No. 18-5042, 2019 WL 3938633, at *16 nn.10, 16 (10th Cir. Aug. 20, 2019) (citing *West*, 487 U.S., at 54).  NRC subcontracts with Whatcom County to supply nursing and medical administrative services to the Jail.  This includes the full scope of nursing services.  NRC also establishes the Jail's policies, procedures, and medical protocols; coordinates of care with other contract providers and providers in the community, such as the Hospital; and is responsible for overseeing the general administration of the Jail's nursing program.

8.      Defendant PEACEHEALTH d/b/a PeaceHealth St. Joseph Medical Center ("Hospital") is a Washington non-profit corporation, with its principal place of business believed to be Bellingham, Whatcom County, Washington.  Hospital is a health care entity organized under

COMPLAINT - 3

the laws of the State of Washington.  Hospital assumed a traditional governmental function and acted under color of state law by supplying the sole facility to which Jail pretrial detainees were transported to receive "fit for jail" assessments and emergency medical care. *Prasad v. Cty. of Sutter*, 958 F. Supp. 2d 1101, 1122 (E.D. Cal. 2013) (citing *Lopez v. Dep't of Health Servs.*, 939 F.2d 881, 883 (9th Cir. 1991)).

9.      Defendant BILL ELFO is the Whatcom County Sheriff.  He is sued in his Personal Capacity.  Defendant Elfo is a policymaker and supervisor responsible for the provision of medical services, the enactment and implementation of policies, practices, and customs relating to all aspects of the Jail.

10.      Defendant WENDY JONES is the Whatcom County Jail Chief.  She is sued in her Personal Capacity.  Defendant Jones is a policymaker and supervisor responsible for the provision of medical services, the enactment and implementation of policies, practices, and customs relating to all aspects of the Jail.

11.      Defendant CALEB ERICKSON is the Whatcom County Corrections Lieutenant. He is sued in his Personal Capacity.   Defendant Erickson is a policymaker and supervisor responsible for the provision of medical services, the enactment and implementation of policies, practices, and customs relating to all aspects of the Jail.

12.      Defendant STUART ANDREWS ("Dr. Andrews") is the Jail's healthcare provider. He subcontracts with Whatcom County to:

- Conduct sick call at the Jail.

- Examine, diagnose, prescribe, and provide appropriate treatment for inmates who are manifesting symptoms of acute and/or chronic illness or injury.

- Order appropriate and necessary laboratory and x-ray services.

- Record on the permanent Jail Health Record necessary history and physical findings, diagnoses and orders for treatments (including entry into an Electronic Medical Records system.

COMPLAINT - 4

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

- Refer to local specialists those patients, whose medical problems cannot be adequately addressed by other methods or manners, including, but not limited to, consultation with the appropriate specialist, review of written reports, interpretation of medical test results.

- Have access to a number of different physicians, representing a variety of medical specialties, to be available for consultation.

- Provide consultation and necessary medical supervision to the jail nurses and other jail personnel on matters relating to the health of inmates.

- Conduct staff meetings every month with jail medical personnel to address jail medical concerns and protocols.

- Make arrangements to see an inmate whose condition requires urgent care that cannot be delayed until the next scheduled medical clinic.

- Work with the health care practitioners at the Jail to provide information clarification, and opinion regarding medical situations, including, but not limited to, course of treatment, necessity of immediate or postponed direct examination, ordering or interpreting medical tests.

- Provide for telephone consultation with jail medical personnel 24 hours a day, 7 days a week.

Dr. Andrews is sued in his Personal Capacity.  Dr. Andrews is a policymaker and supervisor responsible for the provision of medical services, the enactment and implementation of policies, practices, and customs relating to all aspects of medical services within the Jail.

13.   Defendant SHELLY ANDREWS ("Nurse Andrews") is the Jail's Nursing Supervisor.  She is sued in her Personal Capacity.  Nurse Andrews is a policymaker and supervisor responsible for the provision of medical services, the enactment and implementation of policies, practices, and customs relating to all aspects of nursing within the Jail.

14.   Defendant KRISTINE GLASGOW is NRC's Operations Director/Jail Health Administrator.  She is sued in her Personal Capacity.  Defendant Glasgow is a policymaker and supervisor responsible for the provision of medical services, the enactment and implementation of policies, practices, and customs relating to all aspects of medical care within the Jail.

COMPLAINT - 5

1    15.    Defendant Deputy ADAM MILLER is an employee of Whatcom County.  As a

2    jailer and not a healthcare professional, Defendant Miller's role is to serve as a gatekeeper for

3    medical personnel capable of treating inmates.  He is sued in his personal capacity.

4    16.    Defendant Deputy CHERYL CARDINAL is an employee of Whatcom County.  As

5    a jailer and not a healthcare professional, Defendant Cardinal's role is to serve as a gatekeeper for

6    medical personnel capable of treating inmates.  She is sued in her personal capacity.

7    17.    Defendant Deputy MATT TURNER is an employee of Whatcom County.  As a

8    jailer and not a healthcare professional, Defendant Turner's role is to serve as a gatekeeper for

9    medical personnel capable of treating inmates.  He is sued in his personal capacity.

10    18.    Defendant Deputy JASON MCDONALD is an employee of Whatcom County.  As

11    a jailer and not a healthcare professional, Defendant McDonald's role is to serve as a gatekeeper

12    for medical personnel capable of treating inmates.  He is sued in his personal capacity.

13    19.    Defendant Deputy MATTHEW CHARROIN is an employee of Whatcom County.

14    As a jailer and not a healthcare professional, Defendant Charron's role is to serve as a gatekeeper

15    for medical personnel capable of treating inmates.  He is sued in his personal capacity.

16    20.    Defendant Deputy TIM KIELE is an employee of Whatcom County.  As a jailer

17    and not a healthcare professional, Defendant Kiele's role is to serve as a gatekeeper for medical

18    personnel capable of treating inmates.  He is sued in his personal capacity.

19    21.    Defendant KRISTA ROBINSON is a healthcare provider employed at the Jail.

20    Defendant Robinson is sued in her personal capacity.

21    22.    Defendant Deputy JEFFERY HINDMAN is an employee of Whatcom County.  As

22    a jailer and not a healthcare professional, Defendant Hindman's role is to serve as a gatekeeper for

23    medical personnel capable of treating inmates.  He is sued in his personal capacity.

24

25

COMPLAINT - 6

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1

23.    Defendant Deputy VIOLET IGNASHOVA is an employee of Whatcom County.

2

As a jailer and not a healthcare professional, Defendant Ignashova's role is to serve as a gatekeeper

3

for medical personnel capable of treating inmates.  She is sued in her personal capacity.

4

24.    Defendant Deputy MIRIAH BROWN is an employee of Whatcom County.  As a

5

jailer and not a healthcare professional, Defendant Brown's role is to serve as a gatekeeper for

6

medical personnel capable of treating inmates.  She is sued in her personal capacity.

7

25.    Defendant Deputy JOSHUA FARMER is an employee of Whatcom County.  As a

8

jailer and not a healthcare professional, Defendant Framer's role is to serve as a gatekeeper for

9

medical personnel capable of treating inmates.  He is sued in his personal capacity.

10

26.    Defendants JOHN DOES 1 - 10 are subcontractors, employees, and/or agents of

11

Whatcom County.  Each JOHN DOE 1 - 10 was within the scope of his/her employment at all

12

times relevant hereto.  Each JOHN DOES 1 - 10 was negligent; acted in furtherance of an official

13

and/or *de facto* policy or procedure of negligence; and/or were responsible for the promulgation

14

of the policies and procedures and permitted the customs/practices pursuant to which the acts

15

alleged herein were committed.  Their identities are unknown at this time and will be named as

16

discovery progresses.

17

27.    Defendants JOHN DOES 10 - 15 are subcontractors, employees, and/or agents of

18

NRC.  Each JOHN DOE 10 - 15 was within the scope of his/her employment at all times relevant

19

hereto.  Each JOHN DOES 10 - 15 was negligent; acted in furtherance of an official and/or *de*

20

*facto* policy or procedure of negligence; and/or were responsible for the promulgation of the

21

policies and procedures and permitted the customs/practices pursuant to which the acts alleged

22

herein were committed.  Their identities are unknown at this time and will be named as discovery

23

progresses.

24

25

COMPLAINT - 7

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

28.     Defendants JOHN DOES 16 - 20 are subcontractors, employees, and/or agents of Hospital.  Each JOHN DOE 16 - 20 was within the scope of his/her employment at all times relevant hereto.  Each JOHN DOES 16 - 20 was negligent; acted in furtherance of an official and/or *de facto* policy or procedure of negligence; and/or were responsible for the promulgation of the policies and procedures and permitted the customs/practices pursuant to which the acts alleged herein were committed.  Their identities are unknown at this time and will be named as discovery progresses.

29.     Each and every Defendant was personally involved in Paula's constitutional deprivations in that they: (1) participated directly in the alleged constitutional violation; (2) after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred, allowed the continuance of such a policy or custom, or ratified the acts of subordinates thereby establishing a policy or custom; (4) was grossly negligent in supervising subordinates who committed the wrongful acts; and/or (5) exhibited deliberate indifference to Paula's rights by failing to act on information indicating that unconstitutional acts were occurring.

## II.     JURISDICTION AND VENUE

30.     This action arises under Washington State's wrongful death law and the Constitution and laws of the United States, including 42 U.S.C. § 1983. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

31.     Venue is proper in the Western District of Washington pursuant to 28 U.S.C.§ 1391(b)(1) and (b)(2). Whatcom County is located in this District, and the events and omissions giving rise to the claims in this action occurred in this District

COMPLAINT - 8

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1

### III.   STATUTORY COMPLIANCE

2      32.      On July 12, 2016, Plaintiff filed an administrative claim for damages with Whatcom

3   County.  A supplemental administrative claim was filed on October 28, 2019.  More than sixty

4   days (60) have elapsed since the filing of that administrative claim.  Plaintiffs have satisfied the

5   prerequisites to the maintenance of this action per Chapter 4.92 RCW.

6                              ### IV.   STATEMENT OF FACTS

7   **A.   AUGUST 9-10, 2017**

8      33.      On August 9, 2017, at about 11:20 a.m., Police Officers of the Lummi Nation Police

9   Department ("Tribal Police") were dispatched to a possible Driving Under the Influence ("DUI")

10   on the 2700 block of Lummi Shore Road, on the Lummi Indian Reservation.

11      34.      Tribal Police came upon Paula in her vehicle in front of her house with two cans of

12   Four Loko inside the vehicle, one of which was about ¼ full and set inside the cup holder in the

13   console of the vehicle.  "Four Loko is a fruit-flavored malt beverage that is sold in 23.5 ounce

14   cans. Each can of Four Loko is 12% alcohol by volume."  *Phusion Projects, Inc. v. Selective Ins.*

15   *Co. of S.C.*, 46 N.E.3d 1190, 1192 (Il. App. 2015).

16      35.      Paula was visibly intoxicated and lost her balance on almost every Standardized

17   Field Sobriety Test administered by the Tribal Police.

18      36.      Paula was then transported to the Lummi Police Department, where at 12:09 p.m.

19   she was given a breathalyzer test, which registered at a .308 blood alcohol content ("BAC").

20      37.      Tribal Police transported Paula to the Jail, arriving at 2:17 p.m.

21      38.      Based on her .308 BAC, the booking deputy consulted with Defendant Robinson,

22   who concluded that Paula "[a]bsolutely" needed to be set to the Hospital for a "fit for jail" exam.

23

24

25

COMPLAINT - 9

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

39.     At this point, Paula was in the custody of Whatcom County.  *See, e.g.*, ENMCrR 7.2 ("Should the jail require a fit for jail prior to booking, the defendant will still be considered in custody" of the Jail); *see also* SMMCrR 7.2 (same); BNMCrR 7.2 (same).

40.     Paula and the Tribal Police left the Jail at 2:36 p.m. and arrived at the Hospital triage center at approximately 2:50 p.m.

41.     Paula was checked in by Hospital staff, her vitals were taken, and she waited in the triage waiting room for approximately twenty-five minutes.

42.     In the year preceding this incident, Paula was admitted to the Hospital numerous times.  The Hospital was intimately familiar with Paula's numerous serious medical conditions— including frequent seizures—and the medication that was required to keep her in good health.  Yet Hospital employees did not consult Paula's medical records or utilize this information in her treatment.  In fact, the Hospital concealed this information from the Tribal Police and the Jail.

43.     At approximately 3:15 p.m., a Hospital employee (likely a doctor) took Paula's pulse again, listened to her chest and back, and examined her eyes.  After performing this "test," this Hospital employee told the Tribal Police that Paula "appeared fit, but was at a high risk for withdrawal" and that he would get Paula "cleared and out of the Hospital shortly."

44.     **The Hospital did not administer a toxicology screen or otherwise take any efforts to determine what/how much substance(s) Paula had ingested**.

45.     The Hospital did not prescribe any medications or offer any recommendations other than a "f[ollow] u[p] with her physician in 3 days for further evaluation and treatment."

46.     Approximately fifteen minutes later, at 3:30 p.m., another Hospital employee (likely a nurse) entered the room with Paula's discharge paperwork.  This Hospital employee told Paula and the Tribal Police that Paula was "at a high risk for withdrawal."  The Tribal Police asked

COMPLAINT - 10

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

"if [Paula] needed any prescriptions," to which the Hospital employee responded, "it would be as the Jail saw fit."  No prescriptions were issued by the Hospital.

47.     Paula arrived back at the Jail roughly one hour and ten minutes after she left for the examination, at 3:47 p.m.

48.     Paula was placed in a Jail shower/holding area at 4:01 p.m., and Defendant Farmer—who is not health trained—administered the Jail's medical and booking questionnaire.

49.     Defendant Farmer indicated that Paula answered "yes" to having numerous serious health issues (e.g., "don't have a liver or kidney," "has liver failure," "had a seizure 3 weeks ago," "has high blood pressure, Hep C, [and] has skin cancer") and previously being "hospitalized for alcohol withdrawal."

50.     According to Defendant Farmer himself, his evaluation of Paula consisted of looking at her identification, going through the medical screening questions, and "accept[ing] the fit for jail paperwork (**reviewing only briefly for medication**)."

51.     At no time did Defendant Farmer review or request a toxicology report to determine what exactly Paula had ingested and was causing her to act "intoxicated" and "slurring her words."

52.     Nor did Defendant Farmer refer Paula to a medical provider immediately, given her known serious medical issues that he was just informed of.

53.     The Tribal Police watched Defendant Farmer administer the Jail's medical and booking questionnaire and left when it was completed—less than ten minutes later.

54.     Defendant Brown—who had just been hired by Whatcom County and had little experience or training on the booking process—conducted a search of Paula's body.

55.     Defendant Brown observed that Paula was still extremely intoxicated and had a hard time understanding her commands.

56.     Defendant Brown did not conduct a "full search" on Paula—just a "pat-down."

COMPLAINT - 11

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

57.     Defendant Brown did not refer Paula to a medical provider.

58.     At 5:00 p.m. Paula was housed on the third floor, in a dormitory room housing thirteen females at the time.

59.     Deputy Brian Lloyd decided to house Paula in general population, because he "didn't think that her blood alcohol content would be a concern for approximately a day or so" and that "she would be fine until medical had a chance to screen her medical screening" on the afternoon of the 10th (the next day).

60.     Because the medical staff had not yet screened Paula's medical records she was given no medication at this time.  According to Deputy Lloyd, this was in accordance with Whatcom County and NRC's policy: "Usually the policy is medical staff screens her medical screening within twenty-four hours and then decides what treatment they're going to give her."

61.     At roughly 6:00 p.m., Paula hit the call light in the third-floor dormitory.  Deputy Jeffery Hindman answered the call and was informed by Paula that "she was not feeling well and that she knew she would be withdrawing from alcohol."  Deputy Hindman then called someone from nursing, told them of Paula's medical need, and was told to bring Paula down to the first floor, Room 129.

62.     At 6:34 p.m. Paula was rehoused on the first floor, and a portable breath test was administered.  According to Deputy Lloyd, who conducted the test, Paula's BAC registered at "approximately .25."

63.     At some point after being housed on the first floor Paula was so sick that, according to Defendant Turner, "she asked for um, new clothing cuz she had soiled her clothing"—a request that Defendant Turner ignored.

64.     Shortly thereafter, Defendant Turner observed that Paula was "vomiting into the toilet"—which he also ignored.

COMPLAINT - 12

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

65.     From his position at Control during his two-hour rotation on the First Floor, Defendant Deputy Adam Miller also observed the physical manifestations of Paula's serious medical needs (*i.e.* vomiting) and heard her requests for medical aid—which he too ignored.

66.     Defendant Miller also failed to check on Paula as required by policy and the applicable standard of care.

67.     Indeed, Defendant Miller is known by Whatcom County and its supervising employees to flout official policy, at times even having sexual relationships with inmates and intimidating inmate-witnesses who might testify against him.

68.     Paula's last phone call was to her son, Jessie, at some time in after her transfer to the first floor.  She told him that she loved him and that unless she got some medical help soon, which she had been requesting, she "was going to die in here."

69.     At roughly 5:50 a.m., the next day, August 10, 2017, Paula informed Defendant Ignashova that she was in serious need of medical care—a request that Defendant Ignashova ignored and did not pass on to the Jail's medical providers.

70.     At approximately 7:00 a.m., Nurse Andrews was advised that Paula was in the need of medical attention due to her "potential withdrawal."  Yet Nurse Andrews—Whatcom County's nursing supervisor—made no contact with Paula or took any efforts to ensure that she was in receipt of the care that she needed to stay safe and alive.

71.     In fact, at no time did Nurse Andrews make contact with Paula.  At no time did Nurse Andrews request, receive, or review medical records from the Hospital.  At no time did Nurse Andrews review anything related to Paula's current presentation.  At no time did Nurse Andrews review or request a toxicology report to determine what exactly Paula had ingested or was supposedly "withdrawing" from.

COMPLAINT - 13

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

72.     Meanwhile, also at roughly 7:00 a.m., Paula informed Defendant Charroin that she was in serious need of medical care—a request that Defendant Charroin also ignored and did not pass on to the Jail's medical providers.

73.     Defendant McDonald ignored similar requests for medical attention.  According to Defendant McDonald himself: "First thing this morning at least two deputies said that she was at the door asking to talk to medical. . . . Between, I would say, six am and ten, ten thirty, I'm not sure exactly, she probably stopped me twice to ask to talk to medical . . . ."

74.     At no point did Defendant McDonald observe Paula eat any of her meals, drink any water, or ingest anything during his entire shift.

75.     According to Defendant McDonald, nobody procured medical attention for Paula because the consensus amongst Jail deputies was that "medical already knows, they know all about her."

76.     At roughly 8:30 a.m., Paula reached out to Deputy Zachary Neufeld, asking for medical attention.  Deputy Neufeld notified Defendant Robinson, who informed him that she was "gonna start some medication for alcohol withdrawals."

77.     Defendant Robinson did not start any medication.  Defendant Robinson merely observed Paula and described her pain and suffering to Jail deputies as sheer "withdrawal symptoms."

78.     Paula indicated to Defendant Robinson that she had just recently been hospitalized due to her other serious medical issues and that she was feeling seriously ill.

79.     The only care provided by Defendant Robinson was to suggest to Paula, "Hey, you have some Gatorade in your cell.  Definitely be drinkin' that Gatorade."  No medication was dispensed, ordered, or prescribed.  No substantive medical care was administered.  At no time did

COMPLAINT - 14

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

Defendant Robinson review or request a toxicology report to determine what exactly Paula had ingested or was supposedly "withdrawing" from.

80.     Deputy Alan Epps observed Defendant Robinson's assessment.  He described Paula at this time appearing obviously "ill," having slurred speech, and that she "just seemed like somebody who was coming down from, from some type of um influence, under the influence of something."

81.     Paula was by this time so weak that Deputy Epps and Deputy Neufeld had to help Paula from her bunk to a chair so that she could be "examined"—and back to her bunk after the "examination" was over.

82.     Shortly thereafter, at roughly 10:10 a.m., Paula complained to Defendant Robinson *again* about her serious medical need.  This request was *again* ignored.

83.     At no time did Defendant Robinson request, receive, or review medical records from the Hospital.  At no time did Defendant Robinson review anything related to Paula's current presentation.  At no time did Defendant Robinson review or request a toxicology report to determine what exactly Paula had ingested or was supposedly "withdrawing" from.

84.     Defendant McDonald's last interaction with Paula was at 10:30 a.m.  Paula *again* asked for medical aid at this time—a request that was *again* ignored by Defendant McDonald.

85.     Defendant Kiele was working a 16-hour shift on August 10, assigned to the first floor where Paula was housed.  He was in charge of "walk throughs" and "security checks" on the entire first floor—and he missed a number of them because "was working in booking on several issues," preparing for his second shift as "acting Sargent."

86.     As to the timing of his checks, Defendant Kiele has attested:

[I]t takes less than a minute to walk through the floor as long as you're checking to make sure that everybody's okay.  Um and so we primarily look to see if here is anybody that's potentially hanging, um anybody that may have medical issues.  On this given day I was notified by the grave yard staff that I relieved that there were

COMPLAINT - 15

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

no close watches, anybody that was under any uh, thirty minute or fifteen minute watches, which would mean that we have a timer in the booking area that we actually set and a buzzer goes off to let us know that we need to go to that specific cell and check on that specific individual.  This morning when I came in there was nobody that we had to have the timer on to go to religiously within a half an hour period.  Um, so I wasn't concerned about that.

87.     According to Deputy Lloyd, however, Paula was indeed put "on thirty minute checks . . . as a female going through withdrawals."  This obviously contradicts Defendant Kiele's self-serving story.

88.     Defendant Kiele did interact with Paula on a number of occasions, however, when she was obviously in need of medical care.  Defendant Kiele knew that Paula was on detox protocol, had come in with a BAC of .308, and that she had recently been in the hospital.  Yet he did not ensure that a more frequent or thorough cell checks were conducted or refer her to a medical provider—even though she was constantly requesting medical aid.

89.     At some time between 8:00 and 9:00 a.m. Dr. Andrews allegedly consulted with someone on his nursing staff, after reviewing Paula's medical record.  Based on Paula's "several health concerns," Dr. Andrews "recommended increased fluid intake" to someone on his medical staff.  At no time did Dr. Andrews make contact with Paula.  At no time did Dr. Andrews request, receive, or review medical records from the Hospital or the Jail.  At no time did Dr. Andrews review anything related to Paula's current presentation.  At no time did Dr. Andrews review or request a toxicology report to determine what exactly Paula had ingested or was supposedly "withdrawing" from.

90.     At 12:27 p.m. Paula was found dead in her cell—almost two hours having passed without any Jail employee conducting a security or safety check.  She was cold to the touch and ashen, with an oxygen level of 70%—which dropped to 58% by 12:38 p.m., when EMTs arrived.

91.     Nurse Brittany Nave, who attempted to administer lifesaving aid to Paula, testified that nobody working on her shift "seemed to know what [Paula's] medical care entailed."

COMPLAINT - 16

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

92.     The Whatcom County Medical Examiner found that Paula died from "probable methadone intoxication."

93.     Defendant Andrews confessed, post-mortem, that "he should have perhaps recommended Narcan earlier in the process."   Narcan is the trade or brand name of the narcotic antagonist "naxolone," which is used "for the complete or partial reversal of narcotic depression, including respiratory depression, induced by narcotics." *State v. Parisi*, 875 N.W.2d 619, 622 n.3 (Wis. 2016).  Narcan was never administered to Paula.

94.     Also post-mortem, Defendants Jones and Nurse Andrews were overheard by Defendant McDonald discussing Paula's past known serious medical issues—presumably because these serious medical issues (which were never treated by Defendants) more likely than not significantly contributed to her death (and Defendants Jones and Nurse Andrews knew it).

95.     Also post-mortem, NRC Operations Director / Jail Health Administrator wrote to Defendant Erickson, alarmed at the substandard care that Paula received at the Hospital:

2).  She was at the hospital for a very short time and they did not really do anything.  I was surprised given her condition and medical history that they did not look closer.  If they had done labs there may have been more information as to what was in her system.

96.     Also post-mortem, Defendant Erickson admitted that the Jail's failure to implement an adequate Fit for Jail policy likely contributed Paula's death by: (a) failing to provide the Hospital with a form to "identif[y] specific labs, medication review, diagnosis, imaging, and suggested follow up care"; and (b) failing to complete "toxicology screening on all inmates who say they are going to withdrawal from drugs or alcohol."

97.     Also post-mortem, Dr. Gib Morrow, the Responsible Physician at the Jail, issued the following critique:

[Paula's] workup [at the Hospital] did not include labs other than a breathalyzer alcohol level which confirmed the presence of alcohol.  Additional labs were not preformed, nor was an ECG obtained during that evaluation.  Despite this individual's chronically ill health status, she was transferred back to jail with an evaluation that she was "fit for jail" but deemed to be at "high risk for alcohol

COMPLAINT - 17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

withdrawal."  In retrospect, labs that might have altered the outcome of this case would include an ECG checking for prolongation of the QT interval on her ECG, given her history of illicit methadone use.  Electrolytes would have perhaps revealed the presence of hypomagnesemia or other electrolyte imbalance which would contribute to the potential for methadone induced arrythmias.  A serum ammonia level, which was elevated at over three times the upper limit of normal on her prior hospitalization admission, may have indicated the likelihood of hepatic encephalopathy which might increase the potential for over-sedation.  A urine or serum toxicology screen would have likely confirmed the presence of methadone, which would have further complicated her already tenuous condition.

98.     Also post-mortem, Defendant Glasgow wrote that the following may have "changed the outcome in this event":

Medical staff could have conducted a drug screen to determine if the patient had anything other than alcohol in her system, as labs/toxicity screen was not completed at the hospital.  The patient had not been incarcerated for some time so medical had not received the patient's chart from archives.  Medical staff could have looked up the patient history in EPIC, as they were awaiting the chart to arrive.

**B.     POLICIES AND ESTABLISHED PRACTICES THAT CAUSED PAULA'S DEATH.**

99.     According to its written policy, Whatcom County has three levels of supervision that are relevant here: (a) "Close watch," which requires visual observation on an irregular 15-minute basis; (b) "Security checks," which require a visual inspection verifying inmate welfare every hour; and (c) "Lockdown security checks," which require a visual inspection verifying inmate welfare every half-hour, and occurs twice a day (during meal service and from 10:00 p.m. until head count is completed around 6:00 a.m.).

100.     In 2017 it was Whatcom County and NRC's established practice to place
CIR 00597
individuals with serious medical needs, including drug and alcohol withdrawal, on hourly "security checks" instead of "close watch."  Defendant Robinson confirmed as much in an interview given shortly after Paula's death.

101.     In fact, in 2017 Whatcom County had no formal security check on the first floor. According to Defendant Erickson himself, "there is no specific policy for placing offenders on or

COMPLAINT - 18

off of segregation (Medical or otherwise)" and the Security Check policy that the County does have "doesn't cover first floor at all."

102.    In 2017 it was Whatcom County and NRC's established practice and policy to conduct medical screening twenty-four hours after an inmate arrives at the Jail, even if the inmate has serious medical condition(s) and is requesting immediate medical aid.

103.    Because Whatcom County's pre-booking area is insufficient to ensure medical confidentiality, the Jail had an established practice of obtaining insufficient medical screenings— which were administered by non-health trained Jail employees.  That this configuration would lead to inmate harm and delays or lapses in medical care was well-known to Jail Supervisors.

104.    As Defendant Jones herself wrote in a recent budget request:

> Our current practice is to ask a series of health screening questions while the offender is waiting, with the arresting officer, in the pre-booking area of the jail. Because this space is on the other side of the security perimeter, questions are asked over a microphone/speaker arrangement, with the Deputy on one side of a thick, impact resistant window and the offender on the other.  This means anyone in the prebooking area can hear both the questions and the response.  Questions cover everything from medications to history of communicable diseases and behavioral health issues.  No[t] surprisingly, offenders are often reluctant to share that information, which can lead to delays in treatment.

105.    Once the inmate is housed, medical care is administered through a food port:



COMPLAINT - 19

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

That this practice puts inmates with medical needs at an increased risk of harm and/or death would be obvious to any medical or corrections professional exercising his or her professional judgment. Whatcom County, NRC, and their policymakers knew that this policy would seriously injure or kill inmates, yet maintained it nonetheless.

106.    Whatcom County, vis-à-vis Defendant NRC, has an established practice of understaffing the Jail's nursing program.  In order to save costs, NRC's pay scale placed their nursing salaries about 15% below average market rates, which left the Jail significantly understaffed.  Understaffing, coupled with the approximately 11% increase between 2016 and 2018 in the number of contacts the nurses are having with inmates, put pretrial detainees at a significantly increased risk of harm and death.

107.    Whatcom County has a policy of overcrowding.

108.    Whatcom County, NRC, and their policymakers set into place a custom or practice of failing to provide sufficient medical health staff coverage for inmates and detainees of the Jail.

109.    Whatcom County, NRC, and their policymakers set into place a policy, custom, or practice of failing to follow the staffing guidelines as set forth in the standards published by the National Commission on Correctional Healthcare.

110.    Whatcom County, NRC, and their policymakers set into place a policy, custom, or practice of providing financial incentives to employees who prevented emergency room visits by inmates and detainees of the Jail.

111.    Whatcom County, NRC, and their policymakers set into place a policy, custom, or practice of not referring inmates and detainees suffering severe withdrawal symptoms to licensed acute care facilities and/or hospital settings.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

112.    Whatcom County, NRC, and their policymakers set into place a policy, custom, or practice of not using intravenous therapy or any other medically necessary care to treat inmates and detainees while they withdraw from opiates or alcohol.

113.    It was not until Whatcom County was sued over this policy that Whatcom County changed its policy.  Complaint, *Kortlever v. Whatcom County*, No. 18-0823 (W.D. Wash. Jun. 6, 2018), Dkt. # 1.

114.    As a result of the *Kortlever* litigation, Whatcom County now has an opiate withdrawal policy, a medication assisted treatment for opioid use disorder maintenance policy, and a medication-assisted treatment for opioid use disorder induction policy.  *Id.* Dkt. # 35-1.  But these policies are too little, too late, for Paula.

115.    Whatcom County, NRC, and their policymakers set into place a policy, custom, or practice of not using intravenous therapy to treat inmates and detainees suffering from dehydration.

116.    Whatcom County, NRC, and their policymakers set into place a policy, custom, or practice of failing to follow monitoring guidelines relating to medical detoxification.

117.    Whatcom County, NRC, and their policymakers set into place a policy, custom, or practice of failing to train its employees in the recognition of severe, progressive, and life-threatening withdrawal and/or overdose.

118.    Whatcom County, NRC, and their policymakers set into place a policy, custom, or practice of failing to establish and carry out a continuous quality improvement program, including a quality improvement committee.

119.    Whatcom County, NRC, and their policymakers set into place a policy, custom, or practice of failing to meet widely accepted community standards of care with regard to medical services for ill or injured inmates and detainees of the Jail.

COMPLAINT - 21

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

120.     Whatcom County, NRC, and their policymakers set into place a policy, custom, or practice of failing to hold regular staff meetings to monitor, plan, or resolve problems with healthcare delivery.

121.     Whatcom County, NRC, and their policymakers set into place a policy, custom, or practice of failing to provide adequate supervision to assistant medical personnel by an on-site physician.

122.     Whatcom County, NRC, their policymakers, and Dr. Andrews set into place a policy, custom, or practice of failing to comport with Dr. Andrews' contract, including a failure to conduct staff meetings every month with jail medical personnel to address jail medical concerns and protocols.

123.     Whatcom County, NRC, and their policymakers set into place a policy, custom, or practice of denying inmates and detainees at the Jail access to appropriate, competent, and necessary care for serious medical needs.

124.     Whatcom County, NRC, and their policymakers set into place a policy, custom, or practice of not providing naxolone (Suboxone or Narcan) to patients suffering from withdrawal.

125.     Whatcom County, NRC, and their policymakers set into place a policy, custom, or practice of denying necessary medical care, if said detainees are thought to be soon released from the jail.

126.      Whatcom County, NRC, and their policymakers set into place a policy, custom, or practice of discouraging transferring detainees to an acute care facility and/or hospital for medical care.

127.     Whatcom County has one of the highest use rates of opioids in the state of Washington.  Yet Whatcom County has one of the laxest intake contraband search policies in the state.  It has been well known at Whatcom County, for years, that (1) the presence of smuggled

COMPLAINT - 22

opiates creates a significant risk of serious harm and/or death to inmates; and (2) the only reliable method for detection of contraband being smuggled in by arrested persons is by the use of a body scanner.  Despite experiencing a death and a number of near-deaths, assaults, and fights (including one that resulted in 3 female offenders going to prison), due to the introduction of drugs into the facility, the Jail has yet to employ the use of a body scanner to ensure that drugs are not smuggled into the facility.  Whatcom County's and its policymakers' maintenance of this policy, despite its known and obvious detrimental consequences, constitutes negligence, gross negligence, and deliberate indifference.

128.    The Jail has a policy of collecting a $5 fee from inmates for all sick calls—meaning that inmates are charged for providing a service that the Jail is legally bound to provide free of cost.  The fact that most pretrial detainees are insolvent, combined with this policy, results in a known and obvious disinclination on the part of inmates to put in formal requests for medical care and an increased risk of serious harm or death.

129.    The Jail is constantly understaffed.  Deputies are routinely unable to complete tasks without interruption, and must work on several different tasks simultaneously, which increases errors and reduces safety.  Sergeants perform as working supervisors, completing not only the administrative function of a first level supervisor, but assisting the Deputies in the routine tasks of the jail.  Staffing is spread so thin that many routine functions, such as security checks, are not performed.  Mandatory training and staff supervision are also difficult due to the Jail's understaffed condition.  All of which results in an increased risk of harm or death to inmates.  Which is what happened here (*e.g.* Defendant Kiele).

130.    The Jail's policy of deeming inmates with a BAC of *above* .25 to be "fit for jail" is out of step with national standards and falls far below the applicable standard of care.  *Cf., e.g.*, City of Olympia, General Order 75.1.6, § I.E ("Corrections staff shall not accept custody of

COMPLAINT - 23

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

prisoners with untreated medical conditions including: . . . Prisoners with a breath alcohol level of 0.25 or greater."); Contract Between Pacific County Sheriff's Office and the City of South Bend, Washington, § II.I.3.a, *available at* https://www.co.pacific.wa.us/commissioner/interlocal-agreements/AUGUST%202012/8-14%20SB%20Boarding%20Prisoners%20Contract.pdf ("An adult must have an breath or blood alcohol level less than .25 grams/210 liters of breath and decreasing" to be "fit for incarceration in the jail").  In fact, it would be obvious to any corrections professional exercising his or her professional judgment that a policy of deeming inmates with a BAC of *above* .25 to be "fit for jail" would put inmates such as Paula at serious risk of harm or death.  Whatcom County's and its policymakers' maintenance of this policy, despite its known and obvious detrimental consequences, constitutes negligence, gross negligence, and deliberate indifference.

131.    The Jail does not have separate spaces for confidential medical examinations, counseling, treatment, and procedures.  Not surprisingly, inmates are often disinclined to submit to treatment in these conditions, which causes delays in treatment—which leads to serious injury and death.  All of which is well known to Whatcom County and its policymakers.

132.    The Jail uses the same room for booking, suicide watch, and medical holding—mixing functions that should be separated:



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1

2   The utilization of this area for combined purposes results in an increased risk that inmates' serious

3   medical needs will not be tended to appropriately—a risk that was well known by Whatcom

4   County.

5       133.   Defendant Elfo, for instance, has publicly admitted that the Jail does not have the

6   "space to appropriately house and treat those with medical and behavioral health issues."  Bill

7   Elfo, *Here's What Sheriff Says of Whatcom County Jail Booking Restrictions*, Bellingham Herald,

8   Jul.    23,    2016,    *available    at*    https://www.bellinghamherald.com/opinion/op-

9   ed/article91348812.html.

10      134.   The Defendants' lack of clear delineation of authority and inadequate means of

11  communication with respect to assessing medical risks was an additional policy that caused their

12  failure to prevent Paula's pain, suffering, and death.  In essence, there is a "who's on first" problem

13  at the Jail where an established practice of non-communication to one another or amongst

14  themselves in regard to inmate medical safety has been implemented.

15      135.   It is a common and widespread practice at the Jail to ignore information related to

16  healthcare in a measured attempt to avoid liability in a deliberate indifference action, by claiming

17  a lack of knowledge.

18      136.   Whatcom County has a policy of placing inmates in solitary confinement cells,

19  without a mental or physical health assessment, regardless of whether the inmate's healthcare

20  needs contraindicated such confinement.

21      137.   Defendants maintained a policy of using cursory health screening that essentially

22  amounted to no screening at all for incoming inmates.

23      138.   Defendants maintained a policy of permitting employees to provide clearly

24  inadequate medical care.

25

COMPLAINT - 25

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

139.     Defendant Whatcom County maintained a policy of underfunding that resulted in understaffing, economy-grade subcontractors, an inability to implement additional medical precautions, and undertraining.

140.     Whatcom County's official policies have remained static for decades.   This, in and of itself created a significant risk of serious harm.  The danger in lack of a more frequent review of policies is that they are not kept current with the emerging body of knowledge that guide most competent corrections officials.  Whether standards have changed as a result of litigation or due to advancements in correctional knowledge, policies without frequent review are behind the times and inadequate to provide sufficient guidance to facility staff, as is the case with the policies of the Jail.

141.     Whatcom County, Sheriff Bill Elfo, and Jail Chief Wendy Jones knowingly allowed numerous deficiencies to go unaddressed for years; as did Dr. Andrews, Nurse Andrews, NRC, and Hospital—each of which was responsible for supervising numerous aspects of medical care for the Jail.  Each of these Defendants maintained a policy or custom of insufficient resources and training, chronic delays in care, and indifference toward medical needs at the jail, and did so knowing of an urgent need for reform.   In addition, Sheriff Elfo and Chief Jones' control over medical providers at the Jail leaves little doubt they were subordinates whose constitutional violations would form the basis for supervisory and municipal liability.

142.     In sum, numerous constitutional violations occurred in regard to Paula's medical care.  The fact that not every single violator is named as a Defendant—and that some are identified merely by placeholder John Does—does not limit supervisor, policymaker, or municipal liability. *Carter v. Broome Cty.*, No. 16-0422, 2019 WL 3938088, at *7 (N.D.N.Y. Aug. 21, 2019).

143.     Upon information and belief, some of the above-discussed policies were changed *after* Paula's death.  While it is worthy that Whatcom County and NRC have finally addressed

COMPLAINT - 26

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1  these grievous deficiencies, that these "policies were drafted because of an awareness that the pre-

2  existing policies were substantially likely to lead to a violation of citizens' rights" is a reason for

3  liability, not a defense thereto. *Haberle v. Borough of Nazareth*, No. 18-3429, 2019 WL 4065031,

4  at *3 (3d Cir. Aug. 29, 2019) (quotation omitted).

5       144.    A death in a correctional facility is a very serious incident.  A death by medical

6  complications typically causes an incident review to occur which includes a complete accounting

7  of what happened, what lessons can be learned from the event and what changes need to be made

8  in order decrease the likelihood that it occurs again.  Had Whatcom County officials had an

9  adequate policy in place to review previous incidents of in-custody deaths, accommodations could

10  have been made that would have kept Paula safe and alive.

11       145.    Upon information and belief, all of the acts and omissions taken in regard to the

12  care and custody of Paula were in accordance with Whatcom County and NRC's established

13  practices and/or were ratified by these entities' policymakers.

14                 **V.**        **CLAIMS**

15  **A.**    **FIRST CAUSE OF ACTION – NEGLIGENCE, MEDICAL NEGLIGENCE, GROSS NEGLIGENCE, AND CORPORATE NEGLIGENCE – WHATCOM COUNTY AND ITS SUBCONTRACTORS**

16

17       146.    Defendant Whatcom County had a nondelegable duty to care for pretrial detainees

18  and to provide reasonable safety and medical care.

19       147.    This duty extends to foreseeable medical harms and includes protecting inmates

20  from medical emergencies that result in death.

21       148.    This duty exists because pretrial detainees, by virtue of incarceration, are unable to

22  obtain medical care for themselves.

23       149.    Whatcom County and its subcontractors breached this duty, and were negligent,

24  when they failed to have and follow proper training, policies, and procedures on the assessment of

25  persons with apparent medical needs.

COMPLAINT - 27

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

150.    Whatcom County and its subcontractors breached this duty, and were negligent, when they failed to adequately treat Paula's medical needs.  Indeed, because Paula's medical needs were entirely ignored, Whatcom County and its subcontractors were grossly negligent.

151.    Whatcom County and its subcontractors also breached that duty, and were negligent, when they failed to have and follow proper training, policies, and procedures on the provision of reasonable and necessary medical care and treatment to inmates.

152.    Whatcom County and its subcontractors also breached that duty, and were negligent, when they failed to ensure adequate and proper medical staffing at the Jail.

153.    Whatcom County and its subcontractors also breached that duty, and were negligent, when they failed to ensure that Paula was properly supervised and/or that cell checks were conducted in a safe and consistent manner.

154.    Whatcom County and its subcontractors also breached that duty, and were negligent, when they failed to ensure that Paula received adequate medication.

155.    Whatcom County and its subcontractors also breached that duty, and were negligent, when they ignored notification of Paula's serious health conditions and need for medical care.

156.    Whatcom County and its subcontractors also breached that duty, and were negligent, when they failed to properly assess and treat Paula prior to her death.

157.    As a direct and proximate result of the breaches, failures, and negligence of Whatcom County and its subcontractors, as described above and in other respects as well, Paula died.

158.    Paula suffered unimaginable pre-death pain, suffering, embarrassment, and terror.

159.    As a direct and proximate result of the breaches, failures, and negligence of Whatcom County and its subcontractors, as described above and in other respects as well, Plaintiffs

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

have incurred and will continue to incur general and special damages in an amount to be proven at trial.

160.    As a direct and proximate result of the negligence of Whatcom County and its subcontractors, Paula's children have suffered the loss of familial association with Paula.  Plaintiffs have suffered and continue to suffer extreme grief and harm due to mental and emotional distress as a result of Paula's wrongful death.

**B.    SECOND CAUSE OF ACTION – MEDICAL NEGLIGENCE, GROSS NEGLIGENCE, AND CORPORATE NEGLIGENCE – HOSPITAL**

161.    Hospital, by and through its employees, including Defendants Doe, owed Paula a duty to follow the accepted standard of care in treating her medical condition.

162.    Hospital and its employees negligently provided treatment to Paula in violation of the applicable standard of care.

163.    Hospital had a duty to select its employees with reasonable care and to supervise all persons practicing medicine within its walls.

164.    Hospital breached that duty by failing to hire competent and properly trained employees, oversee care, and implement safety policies designed to prevent harm to patients.

165.    As a proximate result of the failure to follow the standard of care to which Paula was entitled, prior to his death she consciously suffered enormously. Hospital and its employees' failure to follow the standard of care not only caused enormous pre-death suffering, but also caused and contributed significantly to her wrongful death.

166.    As a direct and proximate result of Hospital and its employees' conduct, as alleged herein, Plaintiffs have suffered a destruction and permanent impairment of their relationship with their mother, a destruction of the parent/child relationship, including the loss of her love and affection all in an amount to be proven at the time of trial.

COMPLAINT - 29

**C.   THIRD CAUSE OF ACTION – 42 U.S.C. § 1983 (*MONELL*) – WHATCOM COUNTY, NRC, POLICYMAKERS**

167.   The acts and failures to act described above were done under color of law and are in violation of 42 U.S.C. § 1983, depriving Plaintiffs of their civil rights.

168.   At the time Paula was detained by the County, it was clearly established in the law that the Fourteenth Amendment imposes a duty on jail officials to provide humane conditions of confinement, including adequate medical care, and to take reasonable measures to guarantee the safety of the inmates.

169.   Defendants Whatcom County, NRC, and their policymakers knew of and disregarded the excessive risk to inmate health and safety caused by the their inadequate formal and informal policies, including a lack of training, funding, and supervision, as identified above.

170.   Defendants Whatcom County, NRC, and their policymakers knew of this excessive risk to inmate health and safety because it was obvious and because numerous other inmates had been injured and/or killed as a result of these inadequacies in the past.

171.   Defendants Whatcom County, NRC, and their policymakers knew of this excessive risk to inmate health and safety because they were identified as precipitating factors to the in-custody death of Paula's cousin, Shannon Jefferson, on March 10, 2014.  *See* Complaint, *Jefferson v. Whatcom County*, No. 17-2-00733-8 (Whatcom Cnty. Super.).

172.   Defendants Whatcom County, NRC, and their policymakers were responsible for a policy, practice, or custom of maintaining a longstanding constitutionally deficient safety and medical and mental health care, and training thereon, which placed inmates like Paula at substantial risk, as discussed above.

173.   There was little to no supervision of Paula and inmates like her because Defendants Whatcom County, NRC, and their policymakers maintained a known policy and custom of understaffing and overcrowding, as discussed above.

COMPLAINT - 30

174.   Indeed, even without the previous in-custody injuries, deaths, and near-deaths, it was obvious that the above-identified policies and established practices would result in the harm caused here. Defendants Whatcom County, NRC, and their policymakers were (1) expressly informed that many of their official policies were being ignored and that their unofficial or *de facto* policies would result in inmate deaths, yet deliberately did nothing to address these unofficial or *de facto* policies; and (2) that many of their official policies would result in inmate deaths, yet deliberately did nothing to address them.

175.   Indeed, Defendants Whatcom County, NRC, and their policymakers had numerous opportunities to obtain training to appropriately address physically ill inmates, but knowingly and deliberately declined to obtain it.

176.   Defendants Whatcom County, NRC, and their policymakers have consistently failed to attend to the serious medical needs of inmates.  Defendants Whatcom County, NRC, and their policymakers knew that there were relatively inexpensive prevention measures available to prevent inmate deaths in situations similar to Paula's.  Yet Defendants Whatcom County, NRC, and their policymakers did not employ any of these measures.  In addition, these defendants knew that its employees were not providing adequate medical care, but continued to employ them nonetheless.

177.   Defendants Whatcom County, NRC, and their policymakers knew of and disregarded the excessive risk to inmate health and safety caused by their failure to provide reasonable and necessary medical care and treatment.

178.   This callousness reflects a custom, pattern, and/or policy wherein Defendants Whatcom County, NRC, and their policymakers either intentionally violated or were deliberately indifferent to the health, welfare, and civil rights of Paula and her fellow inmates.

COMPLAINT - 31

179.     As a direct and proximate result of the deliberate indifference of Defendants Whatcom County, NRC, and their policymakers, as described above and in other respects as well, Paula died a terrible and easily preventable death.  She suffered pre-death pain, anxiety, and terror, before leaving behind a loving family.

180.     As a direct and proximate result of the deliberate indifference of Defendants Whatcom County, NRC, and their policymakers, Plaintiffs have suffered the loss of familial association with Paula, in violation of their Fourteenth Amendment rights.  Plaintiffs have suffered and continue to suffer extreme grief and harm due to mental and emotional distress as a result of Paula's wrongful death.

181.     Defendants NRC and NRC and Whatcom County's policymakers have shown reckless and careless disregard and indifference to inmates' rights and safety, and are therefore subject to an award of punitive damages to deter such conduct in the future.  Plaintiffs do not seek an award of punitive damages against Whatcom County itself, however.

**D.     FOURTH CAUSE OF ACTION – 42 U.S.C. § 1983 (*MONELL*) – HOSPITAL AND ITS POLICYMAKERS**

182.     Hospital is a health care entity organized under the laws of the State of Washington.

183.     Hospital assumed a traditional governmental function and acted under color of state law by supplying the sole facility to which Jail pretrial detainees were transported to receive "fit for jail" assessments and emergency medical care while in custody.

184.     The acts and failures to act described above were done under color of law and are in violation of 42 U.S.C. § 1983, depriving Plaintiffs of their civil rights.

185.     At the time Paula was detained at the Hospital it was clearly established in the law that the Fourteenth Amendment imposes a duty on medical providers to provide adequate medical care and to take reasonable measures to guarantee her safety.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

186.     The Hospital and its policymakers knew of and disregarded the excessive risk to patients' health and safety caused by their inadequate formal and informal polices, as described above.

187.     Hospital and its policymakers were responsible for a policy, practice, or custom of maintaining a longstanding constitutionally deficient health care system, and training thereon, which placed patients like Paula at a substantial risk for harm.

188.     Upon information and belief, the acts and omissions of the healthcare providers that provided Paula with care at the Hospital were ratified by Hospital and its policymakers.

189.     As a direct and proximate result of the deliberate indifference of Hospital and its policymakers, as described above and in other respects as well, Paula died a terrible and easily preventable death. She suffered pre-death pain, anxiety, and terror, and left behind a loving family.

190.     As a direct and proximate result of the deliberate indifference of Hospital and its policymakers, Plaintiffs have suffered the loss of familial association with Paula, in violation of their Constitutional rights.  Plaintiffs have suffered and continue to suffer extreme grief and harm due to mental and emotional distress as a result of Paula's wrongful death.

191.     Hospital and its policymakers have shown reckless and careless disregard and indifference to patient's rights and safety, and are therefore subject to an award of punitive damages to deter such conduct in the future.

**E.     FIFTH CAUSE OF ACTION – 42 U.S.C. § 1983 – ALL INDIVIDUALLY NAMED DEFENDANTS, INCLUDING DEFENDANTS JOHN DOE 1-20.**

192.     The acts and failures to act described above were done under color of law and are in violation of 42 U.S.C. § 1983, depriving Plaintiffs of their civil rights.

193.     Each individually named Defendant was subjectively aware that Paula was in need of medical assistance because of a serious medical condition.

COMPLAINT - 33

194.    From the evidence presented above, a reasonable jailer and/or healthcare provider would have been compelled to infer that a substantial risk of serious harm existed.  Indeed, each individually-named Defendant did infer that a substantial risk of serious harm existed, but failed to take any steps to alleviate this risk.  And Paula died as a result.

195.    Each individually-named Defendant displayed deliberate indifference when they:

a.   Ignored explicit requests to treat Paula's serious medical condition.

b.   Failed to administer a toxicology examination.

c.   Failed to call an ambulance for emergency transport to the local hospital, located minutes away, for diagnosis and treatment, at any time prior to the time of Paula's death.

d.   Failed to call for emergency assistance at any time prior to Paula's death.

e.   Failed to provide appropriate medical examination and treatment to Paula.

f.   Failed to provide prompt medical attention to Paula's serious medical needs.

g.   Failed to obtain a blood pressure reading or any other medical examination reading.

h.   Failed to have and/or follow a detoxification program.

i.   Failed to follow the standards as published by the National Commission on Correctional Healthcare.

j.   Failed to administer intravenous therapy at any time prior to the time of Paula's death.

k.   Ignored the obvious and horrific symptoms that were plainly visible on Paula's person, such as vomiting and soiling her undergarments.

l.   Failed to review the medical chart of Paula, given the circumstances then and there existing.

COMPLAINT - 34

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

m. Failed to follow the policies and procedures relating to the diagnosis and treatment of those suffering from drug and alcohol withdrawal and overdose.

n. Seriously aggravated Paula's medical condition by failing to contact a physician or emergency medical provider when her condition deteriorated, resulting in symptoms such as vomiting, diarrhea, and weakness.

o. Seriously aggravated Paula's medical condition by failing to determine that prescribed medications were being unsuccessfully administered, or in the alternative, in failing to administer prescribed medications by alternative methods such as intravenously, intramuscularly, or rectally.

p. Seriously aggravated her medical condition by failing to consistently document treatment, observations, and vital signs in the medical record.

q. Seriously aggravated her medical condition by failing to provide adequate staffing levels needed for minimally adequate care.

r. Seriously aggravated her medical condition by allowing medical staff to operate without benefit of physician supervision.

s. Seriously aggravated her medical condition by failing to immediately transport her to hospital when there was no licensed physician or medical director on staff at the Jail.

196. "The requirement of deliberate indifference is less stringent in medical needs cases . . . because the responsibility to provide inmates with medical care does not generally conflict with competing penological concerns.  Thus, deference need not be given to the judgment of prison officials as to decisions concerning medical needs."  *Lyons v. Busi*, 566 F. Supp. 2d 1172, 1191 (E.D. Cal. 2008) (citing *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992); *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989)).

COMPLAINT - 35

197.    Paula's in-custody death is "without doubt, sufficiently serious to meet the objective component" of the deliberate indifference test. *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009).

198.    Pre-death, both detention officer and medical provider Defendants understood that Paula was experiencing a medical crisis.  Despite her obvious need, they either dismissed her as a malingerer without undertaking any investigation into her condition or abdicated their gatekeeping roles by failing to relay the problem to medical staff.

199.    As a direct and proximate result of the deliberate indifference of each individually named Defendant, as described above and in other respects as well, Paula died a terrible and easily preventable death.  She suffered pre-death pain, anxiety, and terror, before leaving behind a loving family.

200.    As a direct and proximate result of the deliberate indifference of each individually named Defendant, Plaintiffs have suffered the loss of familial association with Paula, in violation of their Fourteenth Amendment rights.  Plaintiffs have suffered and continue to suffer extreme grief and harm due to mental and emotional distress as a result of Paula's wrongful death.

201.    Each individually named Defendant has shown reckless and careless disregard and indifference to inmates' rights and safety, and are therefore subject to an award of punitive damages to deter such conduct in the future.

F.    **SIXTH CAUSE OF ACTION – AMERICANS WITH DISABILITIES ACT – WHATCOM COUNTY, NRC, AND HOSPITAL**

202.    Defendants Whatcom County, NRC, and Hospital discriminated against Paula by reason of her serious medical conditions, denying her the benefits of the services programs and activities to which she was entitled, including but not limited to the right to be free of discriminatory or disparate treatment by virtue of her serious illnesses.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

203.    Defendants Whatcom County, NRC, and Hospital were not just negligent in treating Paula—they denied her access to medical services at all.

204.    Despite numerous requests for medical services at the Jail, Paula was ignored by Defendants Whatcom County and NRC.  Other inmates—inmates without Paula's serious medical conditions—were not similarly ignored.

205.    Despite coming into the Hospital on a "fit for jail" examination, Paula was not given a toxicology screen.  Other inmates—inmates without Paula's serious medical conditions—were given a toxicology screen.

206.    As a result, Paula suffered harm in violation of his rights under Title II of the American's with Disabilities Act, 42 U.S.C. § 12132.

207.    Defendants Whatcom County, NRC, and Hospital were deliberately indifferent to Paula's serious health needs. Defendants Whatcom County, NRC, and Hospital had actual knowledge of Paula's serious health conditions, and they responded with deliberate indifference by failing to take reasonable steps to prevent her death.

208.    The violation of Paula's rights resulted from Defendants Whatcom County, NRC, and Hospital policy or custom adopted or maintained with deliberate indifference.

209.    Because Paula was involuntarily in state custody, a special relationship arose between Paula and Defendants Whatcom County, NRC, and Hospital such that these Defendants had an obligation and affirmative duty to protect her from serious harm and death.

210.    As a direct and proximate result of the deliberate indifference of Defendants Whatcom County, NRC, and Hospital, as described above and in other respects as well, Paula died a terrible and easily preventable death.  She suffered pre-death pain, anxiety, and terror, and left behind a loving family.

**G.    SEVENTH CAUSE OF ACTION – REHABILITATION ACT – WHATCOM COUNTY, NRC, AND HOSPITAL**

COMPLAINT - 37

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

211.     On information and belief, Defendants Whatcom County, NRC, and Hospital are recipients of federal financial assistance.

212.     Paula is a qualified individual with a disability under the meaning of the Rehabilitation Act.

213.     By reason of his disability, Paula was excluded from participation in or was denied the benefits of the services, programs, or activities of a public entity, specifically the Jail and Hospital, including, *inter alia*, denying her a reasonable accommodation with respect to her serious medical needs by refusing to provide medical services and refusal to administer a toxicology examination.

214.     As a direct and proximate result of the this unlawful conduct by Whatcom County, NRC, and Hospital, through their agents and employees, Paula suffered grievous bodily harm and emotional distress and was deprived of his right to have a reasonable accommodation of her severe disability as guaranteed under §504 of the Rehabilitation Act.

215.     The acts and omissions of Whatcom County, NRC, and Hospital's employees in this regard were intentional, wanton, malicious, oppressive, and made with reckless indifference to Paula's rights, thus entitling Plaintiffs to an award of punitive damages.

## VI.     AMENDMENTS

216.     Plaintiff hereby reserves the right to amend this Compliant.

## VII.     RELIEF REQUESTED

217.     Damages have been suffered by all Plaintiffs and to the extent any state law limitations on such damages are purposed to exist they are inconsistent with the compensatory, remedial and/or punitive purposes of 42 U.S.C. § 1983, and therefore any such alleged state law limitations must be disregarded in favor of permitting an award of the damages prayed for herein.

218.     WHEREFORE, Plaintiffs request a judgment against all Defendants:

COMPLAINT - 38

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

(a) Fashioning an appropriate remedy and awarding general, special, and punitive damages, including damages for pain, suffering, terror, loss of consortium, and loss of familial relations, and loss of society and companionship under Washington State law and pursuant to 42 U.S.C. §§ 1983 and 1988, in an amount to be proven at trial;

(b) Awarding reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, or as otherwise available under the law;

(c) Declaring the defendants jointly and severally liable;

(d) Awarding any and all applicable interest on the judgment; and

(e) Awarding such other and further relief as the Court deems just and proper.

Respectfully submitted this 6th day of August, 2020.

GALANDA BROADMAN, PLLC

s/Gabriel S. Galanda

Gabriel S. Galanda, WSBA #30331
s/Ryan D. Dreveskracht

Ryan D. Dreveskracht, WSBA #42593
Attorneys for Plaintiffs
P.O. Box 15146 Seattle, WA 98115
(206) 557-7509 Fax: (206) 299-7690
Email: gabe@galandabroadman.com
Email: ryan@galandabroadman.com

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509